Ruffin, C. J.
 

 The bill was filed in August, 1838, and seeks the specific performance of a contract for the sale of a tract of land, situate in Anson county. The defendant Joseph A. Liles, resided in Tennessee, and constituted one Nell son P. Liles, of Anson, his attorney to sell and convey the land in question ; and in November, 1835, he entered into a written contract with the plaintiff in the following words: “ 1 have sold Joseph A. Liles’ land, allotted to him in the division of my father’s land, to Jeremiah Henry, say about 1131 acres, for $300. The right to be made and the money paid when the lines are established.” The bill then states that the lines of the land were afterwards ascertained by survey, and they are set out by metes and bounds; that Nelson P., the attorney, refused to make a conveyance to the plaintiff, and that he informed the defendant Joseph A, thereof by letter,, to which he received an answer dated in February, 1837, in which he confirmed the contract and promised that he, Joseph A., would come to Anson in the course of the succeding winter, and would, himself, execute a deed to the plaintiff, and requested that, in the mean while, the plaintiff would take possession of the land and cultivate it, as though it was his own by a full title; that the plaintiff entered accordingly into the land and placed a tenant thereon ; and that Joseph A. Liles did, in December, 1837, come into Anson, and, although the plaintiff offered to perform the contract on his part, he refused to convey to the plaintiff, and conveyed to the other defendant, Elijah Liles,
 
 who
 
 paid nothing for the land, or, if he did, had notice of the previous purchase of the plaintiff, before he paid his purchase money and received his deed. The bill then states, that an action of ejectment had been instituted against the plaintiff^ tenant and himself on tho several demises of the two defendants, J. A. & E. Liles ; and it prays for an injunction and proper conveyances. Both of the defendants put in answers, in which the contract with the plaintiff is admitted
 
 *409
 
 and also the correspondence mentioned in the bill. The answer of Joseph A. Liles states, that in December, 1837, he came to Anson, and went to the plaintiff’s house and informed him, that he had come for the purpose of making a title according to his engagement; but that the plaintiff insisted that, besides a deed, the defendant must give a bond with sureties to protect and indemnify the plaintiff against all loss or expense about ^the land, which bond this defendant admits he refused to give. The answer further states, that', being anxious to end the business and return home, he sent to the plaintiff a request to'come and see him at' the hotise of Nelson P. Liles, where' he was staying, and that fie'accordingly came ; and that then this defendant “ proffered to make him a title for said lands in fee simple with general warranty, which the plaintiff refused to take, uhfess the defendant would give the bond and surety as before stated, and that the defendant refused to give, and then-told the plaintiff, that he was compelled to return home, and that he would sell the land before he slept that'night, if he could- — to which the plaintiff made no reply.” The answer further states, that “believing the matter between the plaintiff and" himself then at an end, he prevailed upon his uncle,- the other' defendant, to purchase the land; and that, about the time he executed a deed to Elijah, the plaintiff asked" this defendant if he had sold his land, to which the defendant replied, that he had and had received part of the purchase money, and the plaintiff' expressed no dissatisfaction.” The answer of Elijah Liles states, that, after the contract between the plaintiff and the agent Nelson P. Liles, “the parties made a survey of the land contracted for, and that" upon the survey it was ascertained, that this defendant'had an older grant, which covered a part of the land, and' that this caused for a time a suspension of the execution of a deed.” The answer then states, that this defendant was informed and believed, that the other defendant Joseph A. had offered to convey to the plaintiff with warranty, blit that the plaintiff demanded also a bond with sureties as a collateral indemnity, as stated in the other answer; a'nd “ that Joseph A. refused to give such
 
 *410
 
 bond, and told the plaintiff, that, unless he would lake a deed and pay the money, he would sell the land to some other person.” The answer further states, “ that this defendant was informed of the meeting between the other parties, and understood that the contract was at an end between them and so believed; and that, when the other defendant applied to this defendant to purchase, he did so at the price of $300, which he paid and received a deed ; and that he made said purchase, believing that the contract with the plaintiff was rescinded, and more for the purpose of accommodating his nephew than for his individual benefit. This defendant further states, that, at the meeting which took place between him and the other defendant for executing the deed arid paying the money, while they were engaged in the business, the plaintiff called and inquired of the said Joseph A.
 
 “ it
 
 he had sold his land to which die other replied, “I have, and have part of the money in my pocket;” and that at this answer the plaintiff expressed no dissatisfaction : And this defendant declares, that, if the plaintiff had objected, he would not have completed the contract; for this defendant then believed the plaintiff’s contract was at an end, and he still believes such was the fact.” It does not appear that an injunction was granted, or what was done in the action of ejectment, or who has been or now is in possession ; and at present the court must suppose the plaintiff retains the possession, at least, of part of the land.
 

 To the answers replications were put in, and the parties proceeded to proofs. The letter of the defendant Joseph A. to the plaintiff, of February, 1837, is exhibited, and, besides the contents as stated in the bill, it contains this clause : “If you remain in the notion of the land, and Nelson wont make you a right, if life lasts I will come next fall and will see if I cant make you a right myself, and old Elijah will have to get the land by law; for I would see him buried before I would give him one foot of my land. I want you to hold the land, if Nelson wont make yon a right, till I come.”— The deed to Elijah Liles is dated the 30th day of December, 1837, and describes the land by the boundaries set forth in
 
 *411
 
 the bill, and as containing 113| acres, and has a covenant of general 'warranty, but with this clause following: Though it is jointly agreed between the parties, that nothing herein contained is binding as to the number of acres, further than the patents or old papers of the land cover lawfully.” Several witnesses have been examined, from whose testimony, and, particularly, that of Nelson P. Liles, it appears, that after the contract with the plaintiff a question arose, whether the title to all the land was good, as Elijah Liles claimed from 20 to 40 acres of it, and on that account the execution of the contract was suspended, until 3. A. Liles-could come in himself, though the plaintiff was to take possession and did so. In the latter part of December, 1837, J. A. Liles arrived in Anson, and went from Nelson P. Liles’ to see the plaintiff, and upon his return he said, that the plaintiff wished him to have the land surveyed again ; and the witness, Nelson P. Liles, advised him not to have a survey at his expense, but to make a deed with warranty at once.— In a few days, say on the 28th of December, the defendant, J. A. Liles, wrote to the plaintiff, that he did not think it necessary to have the land run again, but that he would make him a deed with warranty, and that he was anxious to go home, and wished the plaintiff to come and settle the business. The plaintiff immediately went to Nelson P. Liles’, where Joseph A. Liles was ; and the latter then repeated his offer to make a deed with warranty for all the land, but the plaintiff asked, in addition, a bond with surety for the title, which the other refused to give. After some conversation between them on the subject without coming to any agreement, Nelson P. Liles, the witness, remarked, “ that it was useless to say any thing more about it, as the plaintiff asked a bond and surety, and the defendant Joseph A. refused to give it, and there was an end of it.” But the plaintiff thereupon replied, “ that he did not say, he would not take a deed without bond and surety, but that he should ask bond and surety ; and. that then Joseph A. said, “if it was not fixed then, it was likely it would never be, as he intended to sell the land before he slept, if he could whereupon the plain
 
 *412
 
 tiff replied to him, “ that whoever bought it would buy a law suit.” Two days afterwards the plaintiff went back to Nelson P. Liles’ and tendered the price, $300, to the defendant Joseph and demanded a deed, though lie said lie did not expect the other party would make it, as he had understood ■he had sold the land to Elijah Liles ; and Joseph refused to receive the money, saying'he had sold to Elijah and he could not take two men’s money; and then the plaintiff said, that whoever had bought the land had bought a law suit, and gave him notice, that he, the plaintiff, was in possession and should keep it. At that time the defendant Joseph A. had received part of the purchase money from the other defendant Elijah, and, afterwards on the same day, he received the residue and executed a deed.
 

 Upon-this case it is to be observed, .in the first place, that the defendant Elijah must abide by the decree that might be made against Joseph A. Liles, were the latter the .only defendant. The possession of the plaintiff is
 
 prima facie
 
 .evidence of a title in fee, and is notice to one, -who is treating for the fee with one out of possession, of the nature of the title of the tenant.
 
 Daniels
 
 v
 
 Davison,
 
 16 Ves. 249. But there is no doubt of actual notice here-; for the answer does not profess that Elijah was a purchaser without notice of the plaintiff’s contract, but puts his case upon the fact, as he believed it, that -it had been rescinded. As to that, he should have enquired of the plaintiff, and it is his own fault to have relied on rumor, if it should turn out that there was no such rescinding of the contract.
 

 Upon the point of rescinding, there is nothing to raise even a suspicion of it — whatever other reasons there may be for not decreeing the relief the plaintiff asks. That such an agreement as this may be rescinded by parol, need not be questioned; but, certainly, it can only be by a new and distinct agreement, clearly proved by unexceptionable evidence. But these parties, undoubtedly, never carne to any new agreement; nor did the plaintiff ever intimate a purpose of even renouncing his contract, much less come to a contract of that sort. On the the contrary, the parties dis
 
 *413
 
 puted what were their respective rights under the contract; and when, in consequence of their not agreeing in that res pect, the witness, N. P. Liles, said, “ that it was useless to say any thing more about it, for the one asked what the other would not give, and there was an end of it,” the plaintiff replied, “that he did not say that he would not take a deed without the bond.” This reply shews conclusively, that the plaintiff, so far from giving up, insisted on the agreement, for, lest the equivocal expression, “there is an end ofit”— which might mean, either that they might then and there dispute, as each seemed to be settled in his mind upon it, or that it put an end to the bargain itself — might be construed in the latter sense, the plaintiff promptly corrected such latter inference by denying that he intended to refuse a deed. There is, therefore, nothing like a rescinding or even abandoning this contract.
 

 But the defendants say, that, as the right to specific performance is not absolute,
 
 ex debito justilia,
 
 but in the sound discretion of the chancellor, the plaintiff is not entitled to it, because the defendant will thereby be decreed to convey, perhaps, thirty acres of land, which, since the contract, it has been discovered he cannot do, as he has not the title ; and because, by refusing a conveyance, which the other party was willing to make for the whole with warranty, and insisting on new and oppressive terms, the plaintiff was trifling with his vendor, by delaying him of his purchase money, and keeping him unreasonably, at a great distance and upon expense, from home.
 

 As to the first reason, it is true the Court of Equity may leave a party to his action at law, where the vendor believed he could convey an estate when he agreed to sell it, but af-terwards discovered he had
 
 no
 
 title to it, as in the case of
 
 Howell
 
 v
 
 George,
 
 1 Mad. 9. But it. cannot be maintained, that a vendor is not to be compelled to. convey any part of what he sold, because he cannot make a good title to all ; for both good sense and the law say, that, if the vendee choose, he may take all the vendor can convey, with a reasonable compensation, or proportional deduction, for the part
 
 *414
 
 he does not get.
 
 Wood
 
 v
 
 Griffifth,
 
 1 Swanst. 54.
 
 Martlock
 
 v
 
 Buller,
 
 10 Ves. 316.
 
 Todd
 
 v
 
 Gee,
 
 17 Ves. 280.— Bat in this stage of the case the question does not arise. It does not appear yet, that there is a defect of title to any part. The bill mentions nothing upon the subject; and, should the plaintiff bo willing to take the title as it is, without covenants from the vendor, there can be no objection to the decree. But it is certain, almost, that the plaintiff will require covenants, and, according to the universal usage of the country and the understanding of the profession, the court would, perhaps, be bound to direct the usual covenants of general warranty. But, whatever may be the rule generally,.it is clear that, if a conveyance be decreed at all in this case, it must be with warranty, as it is manifest, not only from the evidence but from the answers, that it was in the contemplation of these parties, as a material part of the contract, although not mentioned in the written agreement. If, therefore, either party should wish to have the title ascertained, so as to see what the defendant may safely warrant,, he can, at the proper time, have a reference to the master to enquire into the title and the other matters material to the decree, it a partial defect should be found. But the probability that the defendant has not a good title to some part, or even the certainty of it, forms no objection in his mouth to his conveying what he can, if the plaintiff is willing to take it.
 

 Upon the second reason urged, we agree that, although the plaintiff may not have rescinded the contract nor abandoned it, yet, if his conduct was not fair, but he attempted, by raising frivolous objections, to delay and weary out the defendant, wantonly insisting on unreasonable conditions and assurances, and thereby to baffle the vendor and leave him at a loss to know what to do or to depend on, then the court should give him no assistance. Equity requires good faith and prompt action on the part of one, who asks for specific execution from another. But the court cannot perceive in the conduct of^ the plaintiff any thing, from which the imputation of such purposes can in fairness be made. The fact is,, that neither party acted with perfect propriety, legal-
 
 *415
 
 ]y speaking, probably for want of advice; for it does not seem that counsel was consulted on either side. But the plaintiff did nothing, that an ordinary person, without advice, might not have done with good intentions, and with a view to having the contract performed in its spirit.
 

 It appears that' the vendor’s father and uncle owned adjoining tracts of land, and that, upon the death of the father, a share of his land was allotted to the defendant Joseph A.; after which and after a sale by his agent to the plaintiff, the uncle asserted that a part of the land, thus allotted and sold, belonged to him. Upon this claim the agent, being uncertain as to its extent and validity, declined making a conveyance, but referred the matter to his- principal. Against that the plaintiff made no unreasonable complaint, but in a proper spirit acquiesced until the principal could be consulted. He was informed of this, and immediately, with considerable irritation towards his uncle for his unfounded claim, expressed a dissatisfaction with the agent at hesitating to convey, defied the uncle, and requested the plaintiff to take possession and hold the land against the uncle, until he could come in and see “ if I cannot make yon a right myself.” In this, too, the plaintiff acquiesced, and, although not bound to take possession until the title was cleared, he did so, as well to oblige the vendor as to fulfil the contract. The plaintiff must naturally have inferred from this, that the vendor asserted an indefeasible title to the whole, and meant, when he came in, to clear and establish it; for as to (he mere matter of executing a deed, that could have been done, as well while he staid in Tennessee as when he came here. The sale had been for a round sum, §>30U ; and it is clear the vendor insisted on the payment of the whole of it, and meant to obtain it by conveying the whole tract, inasmuch as he declared, that he would see Elijah Liles buried, before he would give him one foot of the land, unless he got it by law. When, therefore, the vendor came to this State with the avowed purpose of making “ a right,” had not the plaintiff some cause of surprise, when the other party, without taking any step whatever to clear the title and shew to what
 
 *416
 
 portion of the land his title extended, much less establishing a ' good title to the whole tract, demanded that the purchaser should pay the whole price, upon the execution of a deed with general warranty by himself, residing in a remote situation in another State? But what was the course of (he plaintiff under those circumstances, which he had so little cause to anticipate ?’ He proposed that the vendor should have a survey of the land; doubless wiih the honest and proper view to determine the boundaries of the coflicting claims of Joseph A. and Elijah Liles, or to bring about an adjustment between those parties, so that he might have an undisputed title to the land that should be conveyed to him, whatever that might be, the whole or a part. Thus far there can be no objection to the plaintiff’s conduct; for if Liles had' filed his bill against the plaintiff to carry the agreement into execution, the court would have directed the same thing upon a reference as to the title. This proposition the vendor did not reject at first; but, upon the advice of his brother and agent, be did' finally decline it, without even assigning a reason. Why he should have been so advised or have so determined, it is difficult to conjecture, consistently with a fair intention in either of those persons. It could not have been, that'they were satisfied by the first survey, that Elijah Liles’s claim had no foundation ; for, upon that very survey, Nelson P. Liles had entertained such doubts of his principal’s title; as had induced him to decline-conveying, and the defendant's now say, that Elijah has title to part of the land, or, at least, that' he probably has. Then, why should the vendor have refused an investigation into his title, which he had before asserted'to be good and declared himself determined' to maintain, though he then admitted it to be doubtful as to part?" Especially, why should he accompany that refusal with an offer, notwithstanding the doubtfulness of the title, to convey with warranty and with a peremptory demand on the vendee for an immediate acceptance of the deed and payment of the purchase money? It is painful to the court to impute covert and' sinister motives, when it can be avoided ; and therefore we do not say, that the object was to hurry
 
 *417
 
 the plaintiff, rather than lose his purchase entirely, into parting with his money for a bad title; without due consider ation, upon the inadequate security of a personal covenant from a person living abroad; or to induce hi'm, in a" moment of dissatisfaction on account of the detective title to part of the land, to give up' his purchase altogether; and leave the other parties at liberty to make another sale at the same price to the opposite claimant, and thus get rid of the difficulty in1 the title-. The court does not find that such was the object, and it might be, that the sole purpose was to ascertain, whether the plaintiff would be on or off the bargain ; but we do say, that it was not so obviously uncharitable to account for the conduct of the vendor in- the former manner, as to render the attempt of the plaintiff more fully to secure himself from loss a capricious, wanton orunjust requisition. It is true ^he court never decrees a collateral indemnity, as a provision against a bad title.
 
 Balmanes v Lumley,
 
 1 Ves.
 
 &
 
 Beam. 224. And, therefore, strictly speaking, the plaintiff could not demand it, as it had not been stipulated for. But, on the other hand-, the court would see, as it could not give an indemnity, that the vendee should be compelled to take only the land, to which the vendor could make a good title, and should have a proper compensation, for the deficiency.— Now it seems to-us, that the plaintiff was only desirous of doing substantially the same thing, and of complying yet more fully with- the wishes and-interest of his vendor. For although the plaintiff had no legal authority to call for the collateral indemnity of a bond with sureties, yet, on the other side, he had a right to- have it ascertained how much land the vendor owned and to-have that conveyed to him at a proper valuation in proportion to the price agreed on for the whole. Now it did not suit the purposes of the vendor to settle the business on those terms; for he wished to convey all, whether the title was good or bad, and without investigation, that he might get the whole purchase money and go back with it to- Tennessee. It was then, in truth, an accommodation to him for the plaintiff to depart from his strict right, and agree to take a conveyance, under this new
 
 *418
 
 state of things, to land, to which the title would'probably fail, and pay for it. And he certainly is not to be blamed for declining to accede to what, in the view of the Court of Equity, must be considered a new provision in the contract, without some domestic indemnity from the loss of the money advanced on it and which he would nqt have been compelled to pay, according to the construction of the contract in its original form. It is true, the other side was at perfect liberty to refuse to give the indemnity ; but it was not a hard or unreasonable condition to the modification of the contract asked from him, namely, that he should pay down the whole price, and accept a deed, as if the title to the whole was good, while the parties were aware that the title to one-fifth or one-fourth might not be good. We say, it is true the party was at liberty to refuse to give the indemnity; but, upon doing so, the other party was at liberty also to recur to the contract, as he first made it, and insist upon his rights arising thereon. These were,
 
 at his election,
 
 to take the deed for the whole tract with warranty, as stipulated for; or to take a deed for such part only, as he could get a good title for and pay in proportion ; or to reject the contract
 
 in ioto,
 
 because the other party could not fulfil it, according to the intention in so material a matter..
 
 Leigh
 
 v Crump, 1 Ired. Eq. Rep. 299. Now, insteading of leaving to the plaintiff an election between any two of those methods of proceeding, the vendor declared, that'
 
 he
 
 would do but the one thing, that is, make a deed for the whole tract upon getting the entire price. Even that the plaintiff did not reject; but remarked, “that he did not say, he would not take a deed.” But the defendant would allow no time for consultation or reflection, and declared “that if it was not fixed
 
 ihe/i,
 
 it would never be, for he meant to sell before he sleptand he did sell that very day or the next. The plaintiff might, indeed, have been more explicit in requesting some delay for the purpose of making up his mind, as to which course he would take. But it is probable he was not aware of his right of election. Certainly, his failure to make an immediate declaration of his acceptance of the deed cannot be considered as trifling with or playing upon the vendor; especi
 
 *419
 
 ally when he distinctly told him, that he insisted on his contract. He was not obliged to accede to those terms at all but might have rejected them absolutely and filed his bill for an enquiry as to the title and a conyeyance accordingly: much less was he obliged to accede to them upon the spur of the moment. The urgency, with which he was pushed to a decision, was unseemly and suspicious ; and the haste in declaring the contract at an end, without the concurrence but with the declared dissent of the plaintiff, and in making a new agreement with the vendor’s uncle and upon better terms for the vendor — and all this, after the plaintiff had waited for two years upon
 
 the
 
 vendor to come
 
 in
 
 and clear the title — shews the inclination, not of the plaintiff, but rather of the other party, not to execute the agreement in good faith.
 

 We think, therefore, reserving liberty for either party to move for a reference as to the title, that the plaintiff is entitled to'the usual decree for conveyances, to be approved of .by the clerk, whereby the defendant Elijah shall pass all the title denied by him under the deed to him from the other defendant, and the latter shall covenant for the title ; also to be quieted by injunction in his possession, upon paying into court the purchase money, and interest while he has been in possession, for the use of the defendants, and to be paid to them upon their executing and filing in the office the deeds to be by them respectively made.
 

 Per Curiam, Decreed accordingly.